IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Virginia Stark,

      Plaintiff,

      v.                    Case No. 2:10-cv-642

Mars, Inc., et al.,

      Defendants.


OPINION AND ORDER

    This is an action brought pursuant to the Employee Retirement
Income Security Act of 1974 ("ERISA") and federal common law.
Plaintiff Virginia Stark was an employee of Kal Kan Foods, Inc., a
division of defendant Mars, Inc. ("Mars"), from 1982 to 2004.  The
other defendants named in the complaint were the Mars Benefit Plans
Committee and the Mars Benefit Plans Appeals Committee.

    In her first amended complaint filed on September 10, 2010,
plaintiff asserted claims for breach of fiduciary duty based on
defendants' alleged misrepresentations concerning the amount of her
pension benefits (Count One), promissory estoppel (Count Two),
equitable estoppel (Count Three), and denial of benefits pursuant
to 29 U.S.C. §1132(a)(1)(b) (Count Four).  In an order filed on May
11, 2011, this court granted defendants' motion to dismiss Counts
One and Four insofar as they were asserted against defendant Mars,
and defendants' motion to dismiss Counts One, Two and Three insofar
as they were asserted against defendant Mars Benefit Plans Appeals
Committee.  See Doc. 27.  On June 16, 2011, the parties filed a
joint stipulation of the dismissal of Count Four without prejudice.
See Doc. 35.  On April 4, 2012, an order was entered which granted
plaintiff's unopposed motion to substitute real parties in interest

and stated that the sole defendants in this action are Mars, Inc. and the Mars Inc. U.S. Benefit Plans Committee ("the Committee"). See Doc. 56.  This matter is before the court on the parties' cross-motions for summary judgment.

I. Summary Judgment  Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, by showing that the materials cited do not establish the absence or presence of a genuine dispute, or by demonstrating that an adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(A) and (B).  In considering a motion for summary judgment, this court must draw all reasonable inferences and view all evidence in favor of the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Am. Express Travel Related Servs. Co. v. Kentucky, 641 F.3d 685, 688 (6th Cir. 2011).

The moving party has the burden of proving the absence of a genuine dispute and its entitlement to summary judgment as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party's burden of showing the lack of a genuine dispute can be discharged by showing that the nonmoving party has failed to establish an essential element of his case, for which he bears the

2

ultimate burden of proof at trial.  Id.  Once the moving party meets its initial burden, the nonmovant must set forth specific facts showing that there is a genuine dispute for trial.  Id. at 322 n. 3.  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party."  Niemi v. NHK Spring Co., Ltd., 543 F.3d 294, 298 (6th Cir. 2008).  A fact is "material" only when it might affect the outcome of the suit under the governing law.  Id; Anderson, 477 U.S. at 248.

## II. Factual Record

Although the parties disagree about the legal import of the evidence before the court, there is little dispute as to the events which form the backdrop for plaintiff's claims.  Plaintiff was an employee of Mars until her voluntary resignation in 2004 at age 46.  In 2004, prior to leaving Mars, plaintiff was required to choose between remaining in the Mars Retirement Plan ("MRP"), a defined benefit plan, and the new Associate Retirement Plan ("ARP"), a cash balance plan.  Plaintiff was given a booklet which advised her that her estimated ARP opening balance as of December 31, 2003, would be $297,826.73, and that if she left the company at age 46, her estimated monthly benefit at age 50 would be $2,758.  Doc. 43-9, pp. 3-4.  There is no evidence that this information was inaccurate in light of the information, such as current interest rates, available to the plan at the time.  The booklet further stated that it was intended to provide general information about the plan, that the estimates of plan benefits might not reflect actual plan benefits, and that "if there is any inconsistency between this statement and the plan documents, the terms of the plan documents will control."  Doc. 43-9, p. 6.  Plaintiff elected to enroll in

3

the new ARP plan, thus becoming an ARP-elect participant.

After leaving Mars, plaintiff did not pursue other employment, but instead lived on her savings and did volunteer work. In 2008, plaintiff turned 50 years of age, and was eligible to begin receiving retirement benefits. In August of 2008, plaintiff received a letter dated August 4, 2008, from Mars and Hewitt Management Company regarding her pension benefits. Doc. 45-9. At that time, Hewitt Associates ("Hewitt") was under contract with Mars to operate and maintain the computer database records for the Mars retirement plans. Hewitt employed its own actuaries to assist it in programming the computerized benefits calculations. Hewitt also operated a web page called "Your Benefits Resources" ("YBR"), which provided information to plan participants concerning retirement benefits, and allowed participants to calculate what their potential retirement benefits would be based on potential dates for the commencement of benefits. YRB was also utilized as a source of plan information by the representatives at the Mars Benefits Service Center, a call-in center which answered questions from participants about benefits. Call center representatives relied on the information provided by Hewitt and could not perform their own benefit calculations. The letter advised plaintiff that she could begin receiving benefits at any time, and that she currently had an account balance of $378,763.58.

In February of 2009, plaintiff had exhausted her savings to the point where she needed to secure additional income. She considered re-aligning her investments and beginning a job search, and also investigated the possibility of activating her pension benefits. On February 9, 2009, she visited the YRB website. Plaintiff noted that, according to the website, a single life five-

4

year certain annuity would pay benefits of $5,365 per month, with benefits commencing on June 30, 2009, or December 31, 2009.[1] The website also indicated that as of June 30, 2009, a five-year certain annuity adjusted for inflation would pay $3,669, a ten-year certain annuity would pay $2,309 per year, and a ten-year certain annuity adjusted for inflation would pay $3,644 per year. Doc. 43-15, p. 9. The web page included a disclaimer that "Hewitt Associates does not give any warranty or other assurance as to the content of the material appearing on the site, its accuracy, completeness, timelessness or fitness for any particular purpose." Doc. 43-15, p. 7.

On February 10, 2009, plaintiff spoke with Jessica Pierson, a benefits specialist at the Mars Benefits Service Center. A transcript of the phone call is included in the record. See Doc. 45-13. Plaintiff indicated that she was considering the five-year-certain single life annuity. Using the Hewitt system, Ms. Pierson noted that it was "$5,364.63 a month." Doc. 45-13, p. 2. They discussed how plaintiff would begin the process of commencing benefits, and Ms. Pierson explained that plaintiff should complete the paperwork sixty days in advance of when she wanted to start receiving benefits. Doc. 45-13, p. 4. Plaintiff requested calculations for starting benefits as of June 30, 2009, and December 31, 2009. Plaintiff then stated, "You know, I'll have to be honest that this, the number, for either one, the five-year fixed, or the five-year inflation protected is higher than the

---

[1] The term "certain" referred to this annuity's feature that if the participant died less than five years after commencing benefits, the participant's designated beneficiary would receive the remaining payments, whereas if the participant died after receiving payments for five years, no further benefits would be paid to any beneficiary.

numbers that I thought.  So that was very pleasant."  Ms. Pierson asked plaintiff how long she had worked for Mars, and plaintiff responded, "Twenty-three years."  Ms. Pierson then states, "So, see what a payoff."  Doc. 45-13, p. 5.

By mail, plaintiff received two documents entitled "Pension Estimate Calculation Statement" on Mars letterhead, delivered by Hewitt, dated February 11, 2009, for retirement benefits commencing as of June 30, 2009, and December 31, 2009.  Doc. 45-10; 45-11.  The statements reported that her plan balance at the commencement of benefits on June 30, 2009, was estimated at $398,840.01, and that the balance at the commencement of benefits on December 31, 2009, was estimated at $410,630.59.  Doc. 45-10, p. 1; Doc. 45-11, p. 1.  These statements indicated that for both of these dates, the monthly benefits for a single life annuity, five-year-certain, was $5,364.63.  The payment for the same annuity adjusted for inflation was $3,668.87 as of June 30, 2009, and $3,681.75 as of December 31, 2009.  The monthly benefit for a single life annuity, ten-year-certain was $2,308.63 as of June 30, 2009, and $2,390.19 as of December 31, 2009.  Both documents included the following statement:

> Mars, Incorporated reserves the right to correct any errors.  Specifically, if the estimate conflicts with the benefit defined by the USRP, the USRP will prevail.  Under the law, a plan must be operated in accordance with its terms.

Doc. 45-10, p. 2; Doc. 45-11, p. 2.

After receiving these statements, plaintiff called the Mars Benefits Service Center on February 17, 2009, and spoke again with Ms. Pierson.  This call was also transcribed.  See Doc. 45-14.  Plaintiff asked about starting her benefits as of the end of April.

6

Ms. Pierson verified that plaintiff was requesting the single life annuity with five-year certain and continuance. Plaintiff noted that the amount of the benefit did not change regardless of whether she commenced benefits in April or June, and she asked if she could begin receiving benefits as early as the end of April. Doc. 45-14, p. 1. Plaintiff then decided to begin benefits as of the end of March. Ms. Pierson told plaintiff that she would receive two payments the end of April, one for March and one for April. Ms. Pierson then stated that she was bringing the payment amount up again on the computer screen to make sure it had not changed, and she reported that it was still $5,364.63. Doc. 45-14, p. 5. Ms. Pierson indicated that plaintiff would receive the paperwork for her application for benefits in the mail. Doc. 45-14, p. 7. During this conversation, plaintiff did not comment that the payment amount seemed high or otherwise question the accuracy of the information.

Plaintiff received by mail a packet of materials dated February 18, 2009, which included information about making her pension elections and commencing benefits. Doc. 43-15. These materials also were on Mars letterhead, and delivered by Hewitt. Plaintiff received a "Pension Calculation Statement" which stated that as of March 31, 2009, her plan balance was $392,319.07. Doc. 43-15, p. 35. This statement also listed one beneficiary. The payment options were described as $5,364.63 for the single life annuity with five-year certain, $3,667.80 for the single life annuity with five-year certain adjusted for inflation, $2,279.31 for the single life annuity with ten-year certain, and $3,644.19 for the single life annuity with ten-year certain adjusted for inflation. Doc. 43-15, p. 36. The materials also included the

statement,

> Mars, Incorporated reserves the right to correct any errors. If it is determined at any time that the information provided on this statement conflicts with the benefit defined by the USRP, the USRP will prevail. Under the law, a plan must be operated in accordance with its terms.

Doc. 43-15, p. 38.

In an e-mail to Ms. Pierson dated February 23, 2009, Benefits Specialist Linda Vesey-Connors stated that she had just spoken with plaintiff, who was concerned that the paperwork she received only listed one beneficiary. Plaintiff had designated two sisters as her beneficiaries. Doc. 43-7, p. 2. Plaintiff testified in her deposition that during this conversation, she also asked Ms. Vesey-Connors if the pension amount was correct. Stark Dep., pp. 74-78. Plaintiff did not testify what Ms. Vesey-Connor's response was to this question. Ms. Vesey-Connors testified that she did not recall plaintiff questioning the benefit amount in their conversation. Ms. Vesey-Connors stated that if plaintiff had done so, she would have referred plaintiff's question to Ms. Pierson in her e-mail. Vesey-Connors Dep., p. 18. The e-mail contains no mention of any question by plaintiff concerning the amount of her benefit.

On February 24, 2009, plaintiff signed a pension election authorization form. Doc. 43-15, p. 53. This document stated that plaintiff, through her signature,

> [c]ertifies that I understand that Mars, Incorporated reserves the right to correct any errors. If it's determined at any time that the information provided on this statement conflicts with the benefit defined by the USRP, the USRP will prevail. Under the law, a plan must be operated in accordance with its terms.

Doc. 43-15, p. 54. Plaintiff began receiving monthly payments of $5,364.63 at the end of March, 2009. After plaintiff began

8

receiving pension benefits, she did not engage in a job search or adjust her investments, and she increased her discretionary spending.

Call center representatives cannot independently calculate pension benefits to identify errors, as they rely on the information provided by Hewitt. However, Ms. Pierson testified in her deposition that the fact that a benefit did not change over a three-month period would have prompted her to raise the issue with her supervisor. Pierson Dep., p. 47. She recalled Ms. Vesey-Connors discussing a call she had with another plan participant who thought that the amount of the benefit seemed high. Ms. Vesey-Connors suspected that there might be a glitch in the system and, and she raised the issue with Benefits Service Center Manager Donna Croce Farino at a team meeting in February or March of 2009. Ms. Vesey-Connors recalled that she raised her concern about how the system was calculating single life annuity benefits for ARP-elect associates with either Ms. Farino or Retirement Plans Manager Bethany Kelleher. Ms. Vesey-Connors believed that her managers went to Hewitt with these concerns, and that Hewitt initially reported back that the system was fine. Vesey-Connors Dep., pp. 13-14, 34.

More specifically, the record includes an e-mail dated February 16, 2009, sent by Ms. Kelleher to a Mars contact at Hewitt, Ricky Laguerre, questioning the calculations for another associate, referred to as "B.C." Doc. 43-17, p. 3. Ms. Kelleher asked why the benefit for the single life annuity with five-year certain was higher than other benefit options. Mr. Laguerre responded on February 17, 2009, and stated that B.C. was an ARP-elect participant whose MRP benefit as of June 30, 2004, was higher

9

that the projected ARP benefit.  Under the terms of the ARP, the associate's MRP benefit as of June 30, 2004, the date of transition from the MRP to the ARP, is compared with the benefit available to the associate under the ARP.  If the MRP benefit is higher than the associate's ARP benefit, the MRP benefit in some cases is "grandfathered" into the ARP and the associate receives the higher MRP benefit amount.  Doc. 43-17, p. 4.  Thus, a significantly higher benefit would not necessarily raise questions because it may be a grandfathered or protected benefit.  Deposition of Benefits Manager Amy Slute, pp. 58-59; Farino Dep., pp. 46-47.  A higher MRP amount can also result in the benefit amount remaining the same even though different dates for commencement of benefits are plugged into the equation.  Farino Dep., p. 48.

In the February 17th e-mail, Mr. Laguerre further explained that B.C.'s benefit for the single life annuity with ten-year certain was less than half as much as the benefit for a single-life annuity with five-year certain because B.C. would not have qualified for the ten-year certain annuity under the MRP.  In that situation, no benefit under the MRP was grandfathered and the ARP benefit for the ten-year certain annuity controlled.  However, Mr. Laguerre also noticed that two other ARP annuities (not the single life annuity with five-year certain chosen by plaintiff) were not being compared to the benefits available under the MRP.  Mr. Laguerre indicated that this issue had been submitted internally to Hewitt's Calc Engine Group for research.  Doc. 43-17, p. 5.  His response was sent to Ms. Kelleher and Ms. Farino, and Ms. Farino forwarded the e-mail to Ms. Vesey-Connors.  Doc. 43-17, p. 2.

Hewitt subsequently conducted an internal investigation in which Mars was not involved.  By e-mail dated April 22, 2009,

Melinda Roslon, who was a Hewitt benefit service manager and a Mars contact at Hewitt, advised Ms. Kelleher that Hewitt was continuing to hand-check the calculations to determine the amount of overpayment to four impacted participants, and that she had also consulted with Hewitt's legal resource regarding any recourse for these participants. Doc. 43-18, p. 2. By e-mail dated April 28, 2009, Ms. Roslon advised Ms. Kelleher that Hewitt had completed the review of the ARP-elect overpayments, and determined that since December of 2008, the system had been incorrectly doing a comparison of ARP benefits to the grandfathered MRP benefit. Hewitt also found that the error had affected one additional participant, bringing the total to five. Doc. 43-19, p. 2. Hewitt found that the system was erroneously comparing the ARP benefit for the single-life annuity with five-year certain to the MRP benefit payable at age sixty-five, not at age fifty. After receiving the e-mail on April 28th, Mars requested that Hewitt provide details concerning the problem and do further research on whether the problem affected pension estimates. Ms. Farino instructed the call center representatives not to give out information on benefit amounts to ARP-elect participants.

By letter dated July 31, 2009, plaintiff was advised that the amount of the benefits payments she had been receiving was erroneous. Doc. 45-15, p. 1. Ms. Farino also called plaintiff by phone on August 3, 2009, to inform her of the error and to let her know to expect the letter in the mail. The letter was not sent until July 31, 2009, because it took time to research the error and to determine who was affected by it. Farino Dep., p. 56. The normal course of action is to investigate the situation, get input from the legal department and the actuaries, ask the record-keeper

(Hewitt) to do an investigation, and draft letters to the affected group. Slute Dep., p. 102. The letter informed plaintiff that the correct amount of plaintiff's benefit was $2,303.18, resulting in an overpayment of $3,061.45 for five months, or a total overpayment of $15,307.25. Plaintiff was advised that her monthly benefit would be reduced to $2,199.93, to recoup the amount of the overpayment plus interest.

On September 29, 2009, plaintiff filed a claim with the Committee, seeking the higher benefit amount. Doc. 43-14, p. 2. By letter dated December 23, 2009, plaintiff's claim for the higher benefit was denied. Doc. 43-15, p. 56. The letter also stated that Mars decided to repay the Plan for the $15,307.25 overpayment, plus interest, that plaintiff's monthly benefit would be increased from $2,199.93 to $2,303.12, effective January 31, 2010, and that plaintiff would also receive a check for $515.95 to compensate her for the portion of the overpayment which was deducted from her benefit from August 31, 2009, to December 31, 2009. Plaintiff was also offered the opportunity to suspend her pension payments and to resume them at a later date, and/or to elect another form of payment. Doc. 43-15, p. 58. By letter dated February 11, 2010, plaintiff filed an appeal from the Committee's determination. Doc. 43-16, p. 2. Plaintiff's appeal was denied by letter dated April 12, 2010. Doc. 43-8, p. 2.

<u>III. Estoppel Claims</u>

<u>A. Elements of Estoppel Claims</u>

In Count Two, plaintiff asserts a claim of promissory estoppel, and in Count Three, plaintiff asserts a claim of equitable estoppel. These forms of estoppel have been recognized as viable theories in ERISA cases, and are treated the same way.

Bloemker v. Laborers' Local 265 Pension Fund, 605 F.3d 436, 440
(6th Cir. 2010). The elements of an estoppel claim are: (1) there
must be conduct or language amounting to a representation of
material fact; (2) the party to be estopped must be aware of the
true facts; (3) the party to be estopped must intend that the
representation be acted on, or the party asserting the estoppel
must reasonably believe that the party to be estopped so intends;
(4) the party asserting the estoppel must be unaware of the true
facts; and (5) the party asserting the estoppel must reasonably or
justifiably rely on the representation to his detriment. Sprague
v. General Motors Corp., 133 F.3d 388, 403 (6th Cir. 1998)(citing
Armistead v. Vernitron Corp., 944 F.2d 1287, 1298 (6th Cir. 1991)).

    In Bloemker, the Sixth Circuit held for the first time that
estoppel claims could be asserted in a case involving pension plan
benefits as opposed to welfare plan benefits. Previously, the
court had held that a party cannot seek to estop the application of
an unambiguous written provision in an ERISA plan, as that would
amount to an argument that he justifiably relied on a
representation that was inconsistent with the clear terms of the
plan, and would have the effect of enforcing something other than
the plan documents themselves. Marks v. Newcourt Credit Group,
Inc., 342 F.3d 444, 456 (6th Cir. 2003). However, Bloemker held
that "a plaintiff can invoke equitable estoppel in the case of
unambiguous pension plan provisions where the plaintiff can
demonstrate the traditional elements of estoppel, including that
the defendant engaged in intended deception or such gross
negligence as to amount to constructive fraud, plus (1) a written
representation; (2) plan provisions which, although unambiguous,
did not allow for individual calculation of benefits; and (3)

13

extraordinary circumstances in which the balance of equities strongly favors the application of estoppel." <u>Bloemker</u>, 605 F.3d at 443.

Because the Committee, not Mars, is charged with paying benefits in accordance with the documents governing the Mars Benefit Plans, the Committee is the only proper defendant to the estoppel claims. <u>Cataldo v. United States Steel Corp.</u>, 676 F.3d 542, 553 (6th Cir. 2012). Thus, Mars is entitled to summary judgment on the estoppel claims on this ground. However, in the interests of judicial economy, the court will address the elements of the estoppel claim against both defendants.

B. Representation of Material Fact

In this case, the alleged representations concern the amount of the pension benefit to which plaintiff was entitled. A representation is "material" if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision about retirement benefits. <u>See</u> <u>James v. Pirelli Armstrong Tire Corp.</u>, 305 F.3d 439, 449 (6th Cir. 2002). The court finds that there is no genuine dispute in this case that the representations to plaintiff about the amount of her pension benefit concerned a material matter.

C. Awareness of True Facts by Defendants

The second estoppel element is that Mars and the Committee were aware of the true value of plaintiff's pension benefit. This element requires plaintiff to demonstrate that the defendants' actions contained an element of fraud, either intended deception or such gross negligence as to amount to constructive fraud. <u>Bloemker</u>, 605 F.3d at 443. There is no evidence that Mars, the Committee or the representatives at the call center knew, at the

14

time the estimates were provided, that they were erroneous, or that the estimates were given with the intent to defraud plaintiff.  The record shows that Hewitt was under contract with Mars as the record keeper for the Mars Benefit Plans.  Hewitt was responsible for maintaining the computer systems which performed the benefits calculations.  The YBR website which plaintiff visited was run by Hewitt.  The written benefits statements and forms received by plaintiff stated that they were "delivered by Hewitt."  The Mars call center employees such as Ms. Pierson relied on the information provided by Hewitt, did not do their own benefits calculations, and could not identify calculation errors.  Farino Dep., p. 31.

There is no evidence from which a trier of fact could reasonably conclude that Ms. Pierson or any other Mars representative knew that the estimates provided to plaintiff in February of 2009 from the Hewitt website were incorrect.  See Sheward v. Bechtel Jacobs Co. LLC Pension Plan for Grandfathered Employees, No. 3:08-CV-428, 2010 WL 841301 at *7 (E.D.Tenn. March 4, 2010)(estoppel claim fails where employer was unaware that plaintiff's pension calculation was incorrect at the time of the representation to him).  When plaintiff commented during the February 10, 2009, phone conversation with Ms. Pierson that the amounts seemed high, Ms. Pierson asked plaintiff how long she had worked for Mars, and when plaintiff responded, "Twenty-three years[,]" Ms. Pierson simply stated, "So, see what a payoff." Doc. 45-13, p. 5.  This exchange indicates that Ms. Pierson thought that plaintiff's years of service accounted for the amount of the benefit.

The record is also insufficient to show a genuine dispute as to whether Mars or the Committee or any Mars employee acted with

15

gross negligence tantamount to constructive fraud. Ms. Pierson recalled that, at a team meeting in February or March of 2009, Ms. Vesey-Connors discussed a call she had with another employee who thought that the amount of the benefit seemed high, and raised the possibility that there might be a problem in the computer system. However, the evidence shows that Ms. Kelleher reported these concerns to Hewitt in an e-mail to Mr. Laguerre, and that Hewitt initially reported back that the system was fine. Vesey-Connors Dep., pp. 13-14, 34.

This is corroborated by the February 17, 2009, e-mail from Mr. Laguerre to Ms. Kelleher, explaining that the higher amount was due to the fact that the employee was an ARP-elect participant whose MRP benefit as of June 30, 2004, was higher than the projected ARP benefit. Mr. Laguerre noticed that two ARP annuities (other than the one plaintiff selected) were not being compared to the benefits available under the MRP, and submitted this issue internally to Hewitt's Calc Engine Group for research. Doc. 43-17, p. 5. Mars was not involved in Hewitt's internal investigation. It wasn't until the end of April, 2009, that Mars was notified by Hewitt that a problem stemming from a programming error by Hewitt in December, 2008, led to erroneous estimates for five employees. Mars then conducted its own investigation and determined that plaintiff was one of the affected employees. Mars notified plaintiff of the error in early August of 2009. There is no evidence that Mars had ever encountered a problem with the accuracy of Hewitt's computer services prior to this programming error, or that Mars had any other reason to question the data provided by Hewitt. No trier of fact could reasonably conclude that this conduct constituted gross negligence.

16

There is likewise no evidence to support a claim that the inflated estimates were provided to plaintiff with an intent to defraud. There is no evidence that Mars or the Mars Benefit Plans stood to gain anything by the inflation of plaintiff's pension figures or plaintiff's decision to commence her early retirement benefits when she did. See Pearson v. Voith Paper Rolls, Inc., 656 F.3d 504, 509 (7th Cir. 2011)(noting lack of evidence demonstrating intentional misrepresentation by the plan where the plan had no incentive to provide incorrect information to plaintiff as a plan participant). Plaintiff was no longer employed at Mars when she elected to commence her benefits. This was not a case, for example, of an employer encouraging an employee to take early retirement to accomplish a reduction in force or some other type of economic savings for the company.

At most, the evidence shows that the Mars employees "made an honest mistake" based on their good-faith reliance upon the information provided by Hewitt, and that they were at most "guilty of misfeasance, not the malfeasance that estoppel requires." Crosby v. Rohm & Hass Co., 480 F.3d 423, 431 (6th Cir. 2007); see also Pearson, 656 F.3d at 510 (inadvertent mistake or negligence by the plan in presenting incorrect amounts on pension election form was insufficient to meet the standard of knowing misrepresentation); Schultz-Weller v. Nationwide Mutual Ins. Co., 670 F.Supp.2d 650, 657 (S.D.Ohio 2009)(miscalculation due to payroll error did not support an estoppel claim); Neiheisel v. AK Steel Corp., No. 1:06-cv-030, 2008 WL 163610 at *1 (S.D.Ohio Jan. 17, 2008)(rejecting estoppel claim where there was insufficient evidence suggesting that error in initial calculation of benefits was anything other than inadvertent). The evidence is insufficient

17

to support this element of the estoppel claims or to raise a
genuine dispute in that regard.

C. Intention that Representation be Acted On

The third estoppel element requires an intention on the part
of the party to be estopped that the representation be acted on, or
conduct toward the party asserting the estoppel such that the
latter has a right to believe that the former's conduct is so
intended. In Bloemker, the court found that the complaint was
sufficient to state a claim on this estoppel element where
plaintiff alleged that he received a document stating that he could
elect a pension benefit of a specified dollar amount, including a
certification by the plan administrator that he was entitled to
receive that benefit. Bloemker, 605 F.3d at 443.

However, there is no reference in Bloemker to any type of
disclaimer language, which distinguishes Bloemker from the instant
case. The booklet given to plaintiff in 2004 stated that it was
intended to provide general information about the plans, that the
estimates of plan benefits might not reflect actual plan benefits,
and that "if there is any inconsistency between this statement and
the plan documents, the terms of the plan documents will control."
Doc. 43-9, p. 6. Plaintiff consulted Hewitt's YBR web page, which
included a disclaimer that "Hewitt Associates does not give any
warranty or other assurance as to the content of the material
appearing on the site, its accuracy, completeness, timelessness or
fitness for any particular purpose." Doc. 43-15, p. 7. The
written estimate statement dated February 11, 2009, informed
plaintiff:

> Mars, Incorporated reserves the right to correct any
> errors. Specifically, if the estimate conflicts with the
> benefit defined by the USRP, the USRP will prevail.

18

> Under the law, a plan must be operated in accordance with its terms.

Doc. 45-10, p. 2; Doc. 45-11, p. 2.  A similarly-worded disclaimer is found in the pension election materials dated February 18, 2009, see Doc. 43-15, p. 38, and on the pension election form signed by plaintiff, see Doc. 43-15, p. 54.

These disclaimers, as well as the use of the word "estimate," indicate that Mars and the Committee did not intend for plaintiff to conclude that the pension benefit figures were guaranteed to be accurate.  As to whether Mars or the Committee otherwise intended plaintiff to act on the benefit estimates, there is no evidence in this case that it mattered one way or another to Mars or to the Committee whether plaintiff elected to begin receiving her retirement benefits when she did.  Further, in light of the disclaimers, plaintiff could not have reasonably believed that Mars or the Committee intended for her to rely on the pension estimates as being error-free.  See Coker v. Metropolitan Life Ins. Co., No. 09-14299, 2011 WL 5838218 at *8 (E.D.Mich. Nov. 18, 2011)(noting that plaintiff and plan participant could not have reasonably believed that defendant intended them to rely on confirmation letter in light of disclaimer).  The evidence in the record is insufficient to support this element of the estoppel claim, and no genuine dispute has been shown to exist in regard to this element.

D. Unawareness of True Facts by Plaintiff

The fourth estoppel element requires plaintiff to prove that she was unaware of the true facts.  To satisfy this element, the representation must be made to a party without knowledge of the facts and without the means to ascertain them.  Trustees of Michigan Laborers' Health Care Fund v. Gibbons, 209 F.3d 587, 593

(6th Cir. 2000).  In addition, to assert an estoppel claim for pension benefits in a case where the plan is unambiguous, plaintiff must show that the plan provisions did not allow for individual calculation of benefits.  Bloemker, 605 F.3d at 443.

There is no argument in this case that any of the provisions of the plan were ambiguous.  However, plaintiff states that she did not know that the estimates were erroneous, and argues that the benefit calculations were so complex that she could not reasonably be expected to have verified the accuracy of the estimates herself.

Ms. Farino testified that the calculations for going from an ARP account balance to an annuity are complex and require reference to interest rates and mortality tables.  Farino Dep., p. 43.  Ms. Farino further stated that although there is an example of the calculation in the summary plan description, a participant would still have to use an investment calculator or go to an actuary to determine the exact benefits.  Farino Dep., pp. 43-44.  The record suggests that plaintiff was perhaps more knowledgeable than the typical pension recipient.  Plaintiff stated during the February 17, 2009, telephone call with Ms. Pierson that she was able to look up the Consumer Price Index to calculate the average rate of inflation for the past twenty years, and to determine that the annuity adjusted for inflation was not the better option.  Doc. 45-14, p. 2.  Nonetheless, it would not be reasonable to require plan participants to hire their own actuaries or retirement counselors to verify pension information provided by their employers as a prerequisite for asserting an estoppel claim.

Defendants also argue that plaintiff could have determined from the benefits booklet she received in 2004 that the 2009 pension estimates were not correct.  Plaintiff was given a booklet

20

in 2004 which advised her that her estimated ARP opening balance as
of December 31, 2003, would be $297,826.73, and that if she left
the company at age 46, her estimated monthly benefit at age 50
would be $2,758.  Doc. 43-9, pp. 3-4.  Plaintiff acknowledged that
she received this booklet, and that she consulted it before logging
on to the YBR site, but that she did not look at the other
information in the booklet before beginning her benefits.
Plaintiff's Dep., pp. 31, 34, 36.  If plaintiff had consulted the
2004 statement which she had in her records, she would have learned
that as of 2004, her estimated benefit at age 50 was $2,758, and
would arguably have anticipated a similar figure upon reaching age
50-and-a-half.  However, the 2004 information would not have
provided her with the exact pension benefit calculated five-and-
one-half years later in 2009, when circumstances, such as interest
rates, may have changed.  While defendants' argument regarding the
2004 benefit estimate is relevant to the fifth element of
justifiable reliance, the court will assume for purposes of the
summary judgment motions that plaintiff has satisfied the fourth
estoppel element and that she did not know the true amount of her
pension benefit.

E. Justifiable and Detrimental Reliance

1. Justifiable Reliance

    Plaintiff must also prove detrimental and justifiable
reliance.  In Bloemker, the court found that plaintiff had alleged
sufficient facts to survive a motion to dismiss where plaintiff
alleged that it would have been impossible for him to determine his
correct pension benefit given the complexity of the actuarial
calculations and his lack of knowledge about the relevant actuarial
assumptions.  Bloemker, 605 F.3d at 443.  However, in this case,

21

there is also evidence that plaintiff received a booklet in 2004 which predicted that her benefit at age 50 would be $2,758. Doc. 43-9, pp. 3-4. During the phone conversation with Ms. Pierson on February 10, 2009, plaintiff stated that she thought that the numbers for the five-year-fixed and five-year-inflation annuities were "higher than the numbers that I thought." Doc. 45-13, p. 5.

In addition, the statements provided to plaintiff and the YBR website all had disclaimer language stating that Mars reserved the right to correct any errors, and that if the estimate conflicted with the benefit defined by the plan, the plan would prevail. In light of these disclaimers, plaintiff could not reasonably rely on the estimates being correct. See Livick v. The Gillette Co., 524 F.3d 24, 32 (1st Cir. 2008)(rejecting claim of reasonable reliance on erroneous pension estimates where online estimator had a prominent disclaimer, and every estimate given to plaintiff was clearly labeled as an estimate); Mello v. Sara Lee Corp., 431 F.3d 440, 447 n. 6 (5th Cir. 2005)(plaintiff failed to show reasonable reliance in light of disclaimer which stated that the figures provided were estimates and that the plan would govern the determination of benefits); Perreca v. Gluck, 295 F.3d 215, 225-26 (2d Cir. 2002)(rejecting promissory estoppel claim in light of disclaimer stating that benefits were subject to verification).

Plaintiff relies on Pell v. E.I. DuPont De Nemours & Co. Inc., 539 F.3d 292 (3d Cir. 2008), arguing that the court in that case declined to enforce a disclaimer. However, the circumstances in that case are distinguishable. The court relied on the fact that Pell spoke personally with a pre-retirement counselor, who told him that his service date was February 10, 1971, not an earlier date. The court concluded that Pell was justified in concluding, in light

of this oral exchange, that the counselor "had set the record straight" going forward, despite disclaimer language in previous written communications.  Id. at 302.

In the instant case, the YBR website plaintiff visited on February 9, 2009, contained a disclaimer.  Plaintiff then spoke with Ms. Pierson, a call center employee, on February 10, 2009. Ms. Pierson referred to the online site, then told plaintiff that she was logging on, and that she could see the calculations plaintiff had done the previous day.  Thus, it would have been obvious to plaintiff that Ms. Pierson was looking at the same information plaintiff had seen the previous day online.  After plaintiff stated that she was unable to print the screens, Ms. Pierson stated, "I am happy to get those *estimates* out to you." Doc. 45-13, p. 1 (emphasis supplied).  Thus, unlike Pell, this case did not involve what could reasonably be construed as a definitive representation by a pre-investment counselor concerning a critical component of the benefits analysis, Pell's service date.  Rather, it would have been clear to plaintiff that Ms. Pierson was simply agreeing to send out written "estimates" consisting of printed copies of the benefits calculations plaintiff had already performed on the website, which featured a disclaimer.  Doc. 45-13, pp. 1, 5. The written benefits calculations sent to plaintiff from Hewitt, entitled "Pension Estimate Calculation Statement," also contained disclaimer language.  Doc 45-10.

When plaintiff spoke with Ms. Pierson again on February 17, 2009, plaintiff enquired about initiating her benefits, and Ms. Pierson stated, "I'm just bringing up the *estimates* that we were looking at."  Doc. 45-15, p. 1 (emphasis supplied).  Ms. Pierson explained that at plaintiff's request, she would generate and send

the pension confirmation and authorization forms to plaintiff, telling her "Right now you have just the *estimate*." Doc. 45-14, p. 3 (emphasis supplied). In light of Ms. Pierson's use of the word "estimate," plaintiff could not have reasonably concluded that Ms. Pierson was making any binding representation concerning the amount of her benefits. The Pension Calculation Statement mailed to plaintiff following this conversation contained disclaimer language. Doc. 43-15, p. 38. By signing the Pension Election Authorization Form, plaintiff certified that she understood that Mars "reserves the right to correct any errors" and that if it was determined at any time that the information provided on this statement conflicted with the benefit defined by the plan, the plan would prevail. Doc. 43-15, p. 54.

In light of the evidence presented, including the disclaimers, a reasonable trier of fact could not find that plaintiff reasonably relied on the accuracy of the pension estimates furnished to her.

2. Detrimental Reliance

Plaintiff must also prove that she relied on the representations concerning her pension benefits to her detriment. Detrimental reliance in the ERISA estoppel context requires a showing of economic harm. Pearson, 656 F.3d at 511. In addition, the economic harm shown must be more than purely speculative. Id. (plaintiff's claim that he lost an opportunity to bargain for a better severance package insufficient to show economic harm absent showing that he had any realistic chance of striking a better deal).

Plaintiff has presented an affidavit in which she states that her discretionary spending increased during the first five months she was receiving the inflated pension benefits. The parties

disagree as to the degree to which this occurred, as plaintiff admitted to certain figures during her deposition testimony, then recalculated the percentages in her affidavit.  These discrepancies are not material.  In her deposition, plaintiff acknowledged that her discretionary spending was as follows:

| | |
|---|---|
| August, 2008 | $1,318.43 |
| September, 2008 | $655.83 |
| October, 2008 | $1,906.08 |
| November, 2008 | $1,513.95 |
| December, 2008 | $809.54 |
| January, 2009 | $2,503,95 |
| February, 2009 | $1,111.98 |
| March, 2009 | $1,342.13 |
| April, 2009 | $1,864.45 |
| May, 2009 | $1,605.14 |
| June, 2009 | $1,563.16 |
| July, 2009 | $3,168.69 (includes $1,800 MedVet bill) |
| August, 2009 | $1,715.52 |
| September, 2009 | $815.12 |
| October, 2009 | $1,223.59 |
| November, 2009 | $2,020.64 |
| December, 2009 | $2,173.60 |
| January, 2010 | $1,800.00 |

These figures demonstrate that both before and after the period from March 31, 2009, through July 31, 2009, when plaintiff received the enhanced benefits, plaintiff's discretionary spending, reflected in her credit card statements, was consistently in the $1,000 to $2,000 range, with the exception of August, 2009, which included a $1,800 bill due to the hospitalization of her cat. There are months both before and after the enhanced benefits period in which plaintiff's discretionary spending exceeded her discretionary spending during that period.  Thus, it is unclear which of these expenditures plaintiff would have elected not to incur absent the inflated pension benefits she was receiving.

However, even assuming that there was an increase in discretionary spending during the five-month period, those

increases were modest and are not sufficient to establish economic loss, as they were more than covered by the inflated pension payments which plaintiff was permitted to keep. Mars reimbursed the plan for the overpayment to plaintiff in the amount of $15,307.25, plus interest, refunded to plaintiff the amount which had previously been deducted from plaintiff's checks from August, 2009, to December, 2009, to recoup the overpayment, and permitted plaintiff to keep the overpayment. Doc. 43-15, p. 58. Therefore, regardless of the extent to which plaintiff increased her spending in reliance on the higher amount, the evidence shows that those expenses were covered by Mars' decision not to recoup the overpayment.

There is no evidence that plaintiff incurred any major debt in reliance on the erroneous pension amounts which she was later obligated to pay following the reduction in her benefits. For example, there is no evidence that plaintiff signed a mortgage in reliance on her benefits; the record reveals that plaintiff already owned her home. Although plaintiff had made arrangements for some home improvements and remodeling, she was able to cancel those plans. Stark Dep., p. 116. Plaintiff stated that she had purchased plants for landscaping, and had done some painting and minor repairs in May. Stark Dep., p. 117. Those expenditures would be reflected in the credit card bills discussed above, which would have been covered by the pension payments she received. Plaintiff incurred a bill of $1,800 in July of 2009 when she decided to place her cat in the hospital. However, plaintiff said in her deposition that she did not know if she would have stopped treatment rather than placing her cat in the hospital when his health deteriorated in July had she not had the inflated pension

benefits.  Stark Dep., p. 171.  She had hospitalized him in the past prior to receiving pension benefits.  In any event, the record includes no evidence that any extra expenses plaintiff incurred from March to July of 2009 in reliance on the higher benefit amount were not covered by the overpayment she was allowed to keep.

Plaintiff testified that following the reduction of her benefits, she decreased her discretionary spending, put vacation plans on hold, and decided to euthanize her cat around the end of 2009 when his health deteriorated.  These are actions taken after plaintiff was informed of the accurate amount of her pension benefit.  Although these budget decisions may be an unfortunate consequence of the reduction of plaintiff's benefits to the amount to which she was actually entitled under the plan, they do not constitute acts taken in reliance on any earlier representations of a higher benefit amount.

Plaintiff also argues that had she been aware of the true amount of her pension benefit, she might have pursued other alternatives, such as restructuring her other investments or beginning a job search.  However, there is no evidence that she sustained any economic loss by foregoing these options in February of 2008, when she elected to commence her retirement benefits. There is no evidence that she would have been precluded from restructuring her investments when she learned five months after commencing her benefits that they would be reduced.  In fact, plaintiff stated in her deposition that she subsequently reworked her investments.  Stark Dep., p. 140.  There is also no evidence that plaintiff turned down a job offer or abandoned any promising job prospect in reliance on the higher benefit.  She acknowledged at her deposition in taken in October, 2011, that she did not go

27

back to work or begin a job search after her benefits were reduced, and that it probably would have been difficult for her to obtain employment after being off work for five years. Stark Dep., pp. 82, 133, 140. The mere possibility that plaintiff may have secured employment if she had commenced a job search in February, 2009, is entirely speculative.

Plaintiff further argues that she sustained an economic loss by reason of the fact that her plan account ceased to accrue interest when she began drawing her benefits. Under §5.2(d) of the plan, the account of an ARP participant continued to accrue interest until the last Friday of the month preceding the month in which his or her benefits commence. Doc. 17-1, p. 54. In other words, once plaintiff started to receive benefits, her retirement account no longer accrued interest under the terms of the plan. Plaintiff posits that had she known the accurate amount of her retirement benefit, she may not have elected to begin payments, in which case her account would have continued to accrue interest. However, when asked at her deposition if she would have elected to start her retirement benefits in February of 2009 had she known the correct amount of her benefit, plaintiff answered, "I don't know." Stark Dep., p. 82. Further, in the December 23, 2009, decision denying her appeal, plaintiff was offered to opportunity by Mars to suspend her monthly pension payments and resume them at a later date. Doc. 43-15, p. 58. Plaintiff was given until January 28, 2010, prior to the January 31, 2010, pension payment, to decide whether to suspend her benefits. Despite this offer, plaintiff opted to continue receiving pension benefits. In light of this evidence, plaintiff's argument that she may have opted against starting her benefits so that her account would continue to accrue

interest had she known the true benefit amount becomes mere speculation. Further, the fact that plaintiff was offered the opportunity to suspend her retirement benefits and to resume payments at a later date also means that plaintiff cannot complain of any loss of interest. See Carlo v. Reed Rolled Thread Die Co., 49 F.3d 790, 795 (1st Cir. 1996)(plaintiff not deprived of an ERISA benefit where, after his employer discovered the error regarding plaintiff's retirement benefits, plaintiff was offered the opportunity to continue working so that his retirement benefits would not be adversely affected).

The court concludes that the evidence does not demonstrate the existence of a genuine dispute on the issue of detrimental reliance.

F. Other Factors

As to the remaining estoppel factors required in an ERISA pension plan case, it is undisputed that plaintiff received a written statement. As noted above, there is also evidence that the plan terms, although unambiguous, did not allow for individual calculation of benefits. The third additional factor requires a showing of exceptional circumstances. This factor requires the plaintiff to point to circumstances "beyond the ordinary." Aramony v. United Way Replacement Benefit Plan, 191 F.3d 140, 152 (2d Cir. 1999). The presence of any of the basic estoppel elements of does not in itself render a case "extraordinary." See Pearson, 656 F.3d at 551 (plaintiff's reliance on erroneous pension figures during severance negotiations did not present extraordinary circumstances); Devlin v. Transportation Communications Int'l Union, 173 F.3d 94, 102 (2d Cir. 1999)(reliance, one of the elements of basic estoppel, not sufficient to constitute

29

extraordinary circumstance).

Extraordinary circumstances "generally involve acts of bad faith on the part of the employer, attempts to actively conceal a significant change in the plan, or commission of fraud." Jordan v. Federal Express Corp., 116 F.3d 1005, 1011 (3d Cir. 1997); see also Kurz v. Philadelphia Elec. Co., 96 F.3d 1544 (3d Cir. 1996)(despite erroneous information about pending changes to retirement plan, extraordinary circumstances not found where there was no conduct suggesting that employer sought to profit at the expense of employees, no evidence of repeated misrepresentations over time, and no suggestion that plaintiffs were particularly vulnerable).

Extraordinary circumstances have been found to be present or sufficiently alleged in a case where the employer promised severance benefits to induce the plaintiff to retire, see Schonholz v. Long Island Jewish Med. Ctr., 87 F.3d 72,, 79-80 (2d Cir. 1996), and where the employees devoted twenty to forty years of service to the company in reliance on repeated guarantees of lifetime life insurance benefits at no cost, see Devlin v. Empire Blue Cross and Blue Shield, 274 F.3d 76, 86-87 (2d Cir. 2001)(holding summary judgment for defendant was not appropriate). In Bloemker, the Sixth Circuit held that plaintiff had alleged sufficient facts to survive a motion to dismiss, where plaintiff retired in reliance on a certification that he was entitled to retirement benefits in the amount of $2,339.47 per month, and where he received that benefit for almost two years before he was informed that his benefit would be reduced to $1,829.71, and that he would be required to repay $11,215.16. Bloemker, 605 F.3d at 439, 444.

In Pell, plaintiff was induced to transfer his employment to DuPont based on the representation that his years of service with

30

his previous employer would be counted under the DuPont pension plan. <u>Pell</u>, 539 F.3d at 297-98. From 1984 to 2000, he was repeatedly informed that his previous service date would apply, and was not told until December 19, 2000, that the previous service date information was erroneous. <u>Id.</u> at 298-299. There was evidence that if plaintiff had known that the pension information was erroneous, he could have considered returning to his previous employer rather than making the transfer to DuPont permanent, could have obtained other employment with a better pension, or could have retired sooner to start a consulting business. <u>Id.</u> at 303. The court concluded that the employer's affirmative misrepresentations over an extended period of time and plaintiff's diligence in asking persistent questions about his benefits constituted extraordinary circumstances. <u>Id.</u> at 304-05.

In the instant case, plaintiff left her employment with Mars in 2004, over four years prior to commencing her retirement benefits. There is no evidence that the account summary and benefit estimate she received shortly before she left her employment were inaccurate. The erroneous estimates she received in 2008 were unrelated to her decision to leave her employment in 2004. There is no evidence that plaintiff was persuaded to accept or continue her employment, to decline other employment offers or to leave her employment in reliance on promised benefits. <u>See Devlin</u>, 173 F.3d at 102 (extraordinary circumstances not show where there was no evidence that the employer induced plaintiffs to retire or otherwise used the promise of benefits to induce any particular behavior on plaintiffs' part).

There is also no evidence that Mars or the Committee acted in bad faith or with an ulterior motive, or that they induced

31

plaintiff to begin receiving retirement benefits to further some purpose of their own. Rather, this is simply a case where erroneous information was unwittingly provided due to a computer programming error by Hewitt, the contract record keeper for the plan. The mere fact that plaintiff claims she relied on this information is not enough. See Pearson, 656 F.3d at 551; Devlin, 173 F.3d at 102.

This is also not a case where the same misrepresentations were made over an extended period of time, nor was there an unusual number of inquiries by plaintiff. Plaintiff first consulted the YBR website on February 10, 2009. She then spoke with Ms. Pierson on February 11, 2009, because she was unable to print the screens from the YBR website. Ms. Pierson looked at the same screens which plaintiff had used to make benefit calculations. Although plaintiff commented during the conversation that the benefits seemed higher than she thought, she did not specifically question the accuracy of the information or ask Ms. Pierson to investigate further. After receiving the written estimates dated February 11, 2009, in the mail, plaintiff spoke with Ms. Pierson on February 17, 2009, for the purpose of asking how she could commence her benefits. Plaintiff did not raise any concerns about the amount of the estimate during this conversation. Plaintiff then received a packet of written materials, including an election form. Plaintiff spoke with Ms. Vesey-Connors on February 23, 2009, about the fact that only one of her designated beneficiaries was listed on the form. Plaintiff testified in her deposition that she asked Ms. Vesey-Connors, "Are you sure that the pension number is right?" Stark Dep., pp. 74-75. However, plaintiff did not testify as to what Ms. Vesey-Connors said in response. This telephone

32

conversation was not recorded, and Ms. Vesey-Connors made no mention of this inquiry in her e-mail to Ms. Pierson. Even accepting plaintiff's claim that she questioned the amount of her benefit in her conversation with Ms. Vesey-Connors, this would be only the second time that plaintiff made any statement which could remotely be construed as raising the issue of the accuracy of the benefit estimate. Plaintiff signed the election form on February 24, 2009. The entire application process took two weeks. This case falls far short of the circumstances in <u>Pell</u>, in which the plaintiff repeatedly inquired and was repeatedly assured about the accuracy of his service date over a period of sixteen years.

This case is also distinguishable from the situation in <u>Bloemker</u>, where the plaintiff received benefits for almost two years before being advised of the error, and then was ordered to repay the overpayment. In this case, Mars was not advised by Hewitt until the end of April, 2009, that an error had occurred, and Mars then promptly ordered an investigation to determine how many employees were affected. Plaintiff had just received her fifth benefit check when she was notified of the error on July 31, 2009. The plaintiff in <u>Bloemker</u> was ordered to repay the excess amount of $11,215.16, whereas plaintiff here was not required to repay the plan for the overpayment. Rather, Mars repaid the plan for the overpayment of $15,307.25 plus interest.

The opinion in <u>Bloemker</u> also says nothing about disclaimers. In this case, the website and the written materials all contained disclaimers advising plaintiff that Mars reserved the right to correct any error, and that the terms of the plan would control. In her conversations with plaintiff, Ms. Pierson spoke in term of "estimates," not guarantees, and the written materials dated

February 11, 2009, were also labeled as a pension "estimate."

The court finds that no reasonable trier of fact could conclude that extraordinary circumstances were present in the instant case.

G. Conclusion

For the foregoing reasons, defendants are entitled to summary judgment on plaintiff's estoppel claims.

IV. Breach of Fiduciary Duty

A. Elements of Claim

The Sixth Circuit has recognized an equitable claim by a participant against an ERISA plan fiduciary arising out of 29 U.S.C. §1132(a)(3) when a fiduciary misleads a participant or beneficiary. Moore v. Lafayette Life Ins. Co., 458 F.3d 416, 432 (6th Cir. 2006)(citing Krohn v. Huron Mem. Hospital, 173 F.3d 542, 546 (6th Cir. 1999)). To establish a claim for breach of fiduciary duty based on alleged misrepresentations concerning benefits available under an employee benefit plan, plaintiff must show: (1) that the defendant was acting in a fiduciary capacity when it made the challenged representations; (2) that these representations constituted material misrepresentations; and (3) that the plaintiff relied on those misrepresentations to her detriment. Moore, 458 F.3d at 433. A fiduciary breaches his duty by providing plan participants with materially misleading information regardless of whether the fiduciary's statements or omissions were made negligently or intentionally. Krohn, 173 F.3d at 547. A misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision about benefits. Moore, 458 F.3d at 433.

B. Meaning of "Fiduciary"

The threshold issue is whether Hewitt or the call center employees were acting as fiduciaries when they provided plaintiff with erroneous pension estimates.  Under ERISA,

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. §1002(21)(A).  A fiduciary within the meaning of ERISA is someone acting in the capacity of manager, administrator, or financial adviser to a plan.  Pegram v. Herdrich, 530 U.S. 211, 222 (2000).  The Sixth Circuit employs a functional test to determine fiduciary status.  Briscoe v. Fine, 444 F.3d 478, 486 (6th Cir. 2006); see also Mertens v. Hewitt Assocs., 508 U.S. 248, 262 (1993)(ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan").  Under the statute, an administrator or manager of the plan is a fiduciary only "to the extent" that he exercises discretionary authority, control, or responsibility respecting the management of the plan, the disposition of its assets, or the administration of the plan.  Pegram, 530 U.S. at 225-226; §1002(21)(A).  Thus, it is necessary to ask whether a person is a fiduciary with respect to the particular activity in question.  Briscoe, 444 F.3d at 486.

Persons performing administrative and ministerial functions are not fiduciaries.  Id. at 488 (entity which performs administrative and ministerial tasks that did not involve the

35

exercise of discretionary authority was not a fiduciary); Flacche v. Sun Life Assur. Co. of Canada (U.S.), 958 F.2d 730, 734 (6th Cir. 1992)(defendant company which performed only ministerial functions for the plan was not acting as a fiduciary when it mistakenly calculated plaintiff's retirement benefits); Baxter v. C.A. Muer Corp., 941 F.2d 451, 455 (6th Cir. 1991)(person without power to make plan policies or interpretations and who performs purely ministerial functions such as processing claims, applying plan eligibility rules, communicating with employees, and calculating benefits is not a fiduciary under ERISA).  Department of Labor regulations state that persons "who have no power to make any decisions as to plan policy, interpretations, practices or procedures, but who perform the following administrative functions for an employee benefit plan", including "[p]reparation of employee communications material[,]" "[c]alculation of benefits[,]" and "advising participants of their rights and options under the plan[,]" are not fiduciaries.  29 C.F.R. §2509.75-8 (D-2).  Rather, only persons who perform functions as described in §1002(21)(A) with respect to an employee benefit plan are fiduciaries. §2509.75-8 (D-2).

> Therefore, a person who performs purely ministerial functions such as the types described above for an employee benefit plan within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary because such person does not have discretionary authority or discretionary control respecting management of the plan, does not exercise any authority or control respecting management of the plan, does not exercise any authority or control respecting management or disposition of the assets of the plan, and does not render investment advice with respect to any money or other property of the plan and has no authority or responsibility to do so.

§2509.75-8 (D-2).

36

There is no evidence that Hewitt or any of the employees at the call center exercised any discretionary authority or discretionary control respecting management of such plan, exercised any authority or control respecting management or disposition of its assets, or had any discretionary authority or discretionary responsibility in the administration of such plan. Briscoe, 444 F.3d at 490-91. Hewitt was the record keeper for the plan and did not make benefits decisions. Slute Dep., pp. 13, 23. Rather, Hewitt and the employees at the call center were performing ministerial functions, including the calculation of benefits using information provided by the plan, preparation of employee communications material, advising participants of their rights and options under the plan. The call center employees did not perform their own benefit calculations, and utilized the information provided by Hewitt. The call center employees and Hewitt were not acting as fiduciaries when they provided the erroneous pension estimates to plaintiff. See Livick, 524 F.3d at 29 (human resources representative who provided plaintiff with estimate of future pension benefits was not acting as a fiduciary); Sheward, 2010 WL 841301 at *5 (person performing ministerial function of providing plaintiff with pension estimate was not acting as a fiduciary; the mere fact that an error occurred in the calculation of plaintiff's benefits was not sufficient to support a claim for breach of fiduciary duty).

C. Reliance by Mars and the Committee on Hewitt's Information

A fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with

37

like aims[.]" 29 U.S.C. §1104(a)(1)(B). However, the Department of Labor regulations provide:

> A plan fiduciary may rely on information, data, statistics or analyses furnished by persons performing ministerial functions for the plan, provided that he has exercised prudence in the selection and retention of such persons. The plan fiduciary will be deemed to have acted prudently in such selection and retention if, in the exercise of ordinary care in such situation, he has no reason to doubt the competence, integrity or responsibility of such persons.

29 C.F.R. §2509.75-8 (FR-11); see also Christensen v. Qwest Pension Plan, 462 F.3d 913, 918 (8th Cir. 2006). In the absence of evidence that a fiduciary failed to exercise ordinary care in selecting and retaining a record keeper or in monitoring the accuracy of an automated system, a fiduciary's reliance on erroneous data will not amount to a breach of fiduciary duty. Christensen, 462 F.3d at 918; Hart v. Equitable Life Assurance Society, 75 Fed.App'x 51, 53-54 (2d Cir. 2003); Schmidt v. Sheet Metal Workers' Nat'l Pension Fund, 128 F.3d 541, 547-48 (7th Cir. 1997)(finding no breach of fiduciary duty where trustees were unaware of misstatement of ministerial employee).

There is no evidence that Mars or the Committee breached a fiduciary duty to plaintiff by relying on the information provided by Hewitt. There is no evidence that Hewitt had provided inaccurate information prior to this instance, which was caused by a computer programming error in December of 2008. Mars audits ten percent of retirements on a monthly basis at random to ensure accuracy (plaintiff's benefits were not included in this random sampling). Farino Dep., pp. 27-29. Hewitt also sent Mars audit reports. Slute Dep., p. 18. Ms. Farino was involved in weekly calls to Hewitt to review outstanding cases. Farino Dep., p. 29.

When Ms. Vesey-Connors became concerned about the estimates for B.C., another plan participant, her supervisors promptly brought the matter to the attention of Mr. Laguere at Hewitt, and Hewitt began its investigation into the matter. When Hewitt reported the problem to Mars at the end of April, 2009, Mars began its own investigation. Thus, there is no evidence to support a claim of breach of fiduciary duty based on the retention of Hewitt or reliance on information provided by Hewitt.

D. Detrimental Reliance on Misrepresentations

As noted in regard to the estoppel claims, the pension estimates in this case were material. However, plaintiff must prove that she relied on the misrepresentations to her detriment, and that her reliance on the misrepresentations was reasonable. Moore, 458 F.3d at 433. For the reasons outlined in connection with plaintiff's estoppel claims, the evidence is insufficient to show that plaintiff's reliance on the representations was reasonable, particularly in light of the disclaimers, see Coker, 2011 WL 5838218 at *6 (disclaimer applied to defeat element of reliance for purposes of breach of fiduciary duty claim), or that she relied on the representations to her detriment.

E. Conclusion

For the foregoing reasons, defendants are entitled to summary judgment on plaintiff's claim of breach of fiduciary duty.

V. Ruling on Motions

In accordance with the foregoing, plaintiff's motion for summary judgment (Doc. 45) is denied. Defendants' motion for summary judgment (Doc. 43) is granted. The clerk shall enter judgment in favor of the defendants in accordance with this order and the court's order of May 11, 2010.

Date: July 17, 2012                        s/James L. Graham
                                         James L. Graham
                                       United States District Judge